**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **JORGE CARLOS VERGARA MADRIGAL,** | § § § | |
| **Plaintiff/Petitioner,** | § § | |
| v. | § § | **EP-15-CV-181-KC** |
| **ANGELICA FUENTES TELLEZ,** | § § § | |
| **Defendant/Respondent**. | § | |

## ORDER

On this day, the Court considered Jorge Carlos Vergara Madrigal's First Amended Verified Petition for Return of Children Under the Hague Convention (the "Amended Petition"), ECF No. 58, in the above-captioned case (the "Case"). By the Amended Petition, Vergara alleges that his wife, Angélica Fuentes Téllez ("Fuentes"), wrongfully removed his two minor children, V.V.F. and M.I.V.F. (collectively, the "Children") from Mexico and retained them in the United States without his consent. *See* Am. Pet. 1.[1] In accordance with the Hague Convention on the Civil Aspects of International Child Abduction ("Convention" or "Hague Convention"), Vergara seeks the Children's return to their country of habitual residence in Mexico. *Id.* at 11.

The Case has been a troubling one for this Court. In short, the evidence introduced by the parties causes the Court to wonder whether Vergara cares more about gaining a strategic advantage over his wife in their ongoing divorce proceedings than he does about the happiness

---

[1] When citing to documents that actually appear on the Court's docket, the Court refers to the pagination assigned by the Court's electronic docketing system unless otherwise indicated.

and well-being of his Children.  Indeed, since their separation, Vergara stripped Fuentes and the Children of their security in Mexico without warning, filed  numerous *criminal* proceedings against Fuentes, and – most disturbingly – sought to completely terminate Fuentes's maternal rights on the basis that she is purportedly not "biologically related" to the Children.  Vergara's actions are shocking, even by the standards of a bitter divorce and separation.  Nevertheless, the Court's task is not to adjudicate the merits of the underlying custody dispute, but rather to "determine[] the country in which the custody decision is to be made."  *Sanchez v. R.G.L.*, 761 F.3d 495, 503 (5th Cir. 2014).  In that vein, there is no doubt that the proper forum for the parties' custody dispute is in Mexico.  Thus, for the reasons that follow, the Court **GRANTS** the Amended Petition, and **ORDERS** the Children returned to Mexico.

## I.    FINDINGS OF FACT

The Court held a hearing on the merits of Vergara's allegations on August 17-18, 2015. Having reviewed all admissible evidence in the record, the Court now enters the following findings of fact pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[2]

1.      Vergara is a well-known Mexican businessman, entrepreneur, and founder of Grupo Omnilife ("Omnilife"), a Mexican corporation.  *See* Aug. 17, 2015, Tr. 53:12-24, 133:25-134:6, ECF No. 102.  Among other entities, Omnilife owns Club Deportivo Guadalajara ("Chivas"), a Mexican soccer team.  *See id.* at 97:1-5, 137:22-138:16, 248:10-25.

2.      Fuentes is a well-known entrepreneur, activist, and businesswoman who has principally owned or worked for Mexican companies during her career.  *Id.* at 238:4-240:16, 251:16-252:17.

---

[2] To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

3.     Vergara and Fuentes first met in February 2007 in Ciudad Juarez.  *Id.* at 50:14-21, 242:10-12.  At the time, Vergara lived in Guadalajara, and Fuentes lived in Mexico City.  *Id.* at 51:5-7, 242:13-18.  After their first meeting, their relationship evolved into a professional and personal relationship.  *Id.* at 244:5-9.

4.     In September 2007, Vergara named Fuentes Chief Executive Officer ("CEO") of Omnilife.  *Id.* at 243:11-14.

5.     Shortly thereafter, Vergara and Fuentes began living together in Guadalajara, Mexico.  *Id.* at 244:18-20.

6.     Vergara and Fuentes were officially married in August 2008 in a civil ceremony in Mexico.  *Id.* at 245:1-15; *see also* Certified Marriage Certificate, Pet'r Ex. 2.

7.     On August 12, 2010, Fuentes gave birth to the couple's first child, V.V.F., in El Paso, Texas.  Aug. 17, 2015, Tr. 56:15-20, 246:11-16.  Fuentes gave birth in El Paso, Texas because that was where her doctor was located.  *Id.* at 57:14-19.  A short time after V.V.F.'s birth, the family returned to their home in Guadalajara, Mexico.  *Id.* at 56:21-25, 246:17-22.

*8.*     On September 27, 2010, Fuentes purchased a house in El Paso, Texas.  *See* Special Warranty Deed, Resp't Ex. 29.[3]  Fuentes purchased the home solely in her name.  *See id.*; *see also* Aug. 18, 2015, Tr. 202:14-17, ECF No. 103.

9.     On March 15, 2011, Fuentes – who previously held dual citizenship in both Mexico and the United States – renounced her United States citizenship.  Aug. 17, 2015, Tr. 262:11-14.

10.     In August 2012, Fuentes and Vergara traveled to Fuentes's home in El Paso,

---

[3] Although the Special Warranty Deed indicates that Fuentes closed on the El Paso home on September 27, 2010, V.V.F.'s birth certificate – which was issued on August 17, 2010 – references the same address.  *See* V.V.F.'s Certificate of Birth, Pet'r Ex. 3.  The record does not contain an explanation for this inconsistency.

Texas, to prepare for the birth of their second child.  *Id.* at 64:5-8.  The couple traveled early on

in Fuentes's pregnancy for medical reasons.  *Id.*  Fuentes gave birth to M.I.V.F. in El Paso,

Texas, on January 6, 2013.  *Id.* at 57:23-24.  As a result of pregnancy complications, Fuentes,

Vergara, and the Children remained in El Paso, Texas until approximately February 2013.  *Id.* at

64:5-8.  Thereafter, the entire family returned to Guadalajara, Mexico.  *Id.* at 57:25-58:9, 64:9-

18.

       11.     In January 2014, Vergara, Fuentes, and the Children moved to Mexico City to live

in a high-security apartment complex located at Calle Ruben Dario #115 (the "Ruben Dario

Apartment").  *Id.* at 59:9-12, 60:7-21, 299:25-300:9.  Vergara and Fuentes jointly researched

preschools for V.V.F. and M.I.V.F., and ultimately enrolled the Children in The Roath's School

in Mexico City.  *Id.* at 80:17-23; *see also* Aug. 18, 2015, Tr. 201:8-25.

       12.     During this time, the Children participated in a variety of extracurricular

activities, including ballet, gymnastics, horseback riding, and swimming.  Aug. 17, 2015, Tr.

82:6-20.  V.V.F. also took French lessons in the Ruben Dario Apartment.  *Id.*; *see also* Aug. 18,

2015, Tr. 202:1-4.

       13.     Throughout their relationship, Fuentes and Vergara traveled internationally on a

frequent basis for both business and pleasure.  Aug. 17, 2015, Tr. 86:14-18.  While the Children

sometimes accompanied them on these international trips, the family always returned to their

home in either Guadalajara or Mexico City at the end of their travels.  *Id.* at 90:8-92:9, 288:12-

24; *see also* Aug. 18, 2015, Tr. 203:18-204:6.

       14.     On April 1, 2015, Fuentes traveled with the Children to Punta Mita, Mexico in

accordance with a pre-planned vacation.  Aug. 17, 2015, Tr. 160:1-162:9, 288:25-289:3.  The

original plan was for Fuentes and the Children to travel back from Punta Mita to Mexico City on or about April 6, 2015, and then for Vergara to join them on a trip to Miami, Florida to celebrate the Easter holiday. *Id.* at 160:1-162:9, 288:25-289:14.

15.     However, on or about April 1, 2015, Vergara removed Fuentes as CEO of Omnilife while Fuentes was on vacation with the Children. *Id.* at 161:10-14, 289:15-24.

16.     On April 2, 2015, Fuentes discovered through media reports that Vergara had removed her as CEO of Omnilife. *Id.* at 289:15-24.

17.     Instead of traveling to Mexico City, Fuentes flew to Ciudad Juarez on April 6, 2015, and then continued on to Miami, Florida with V.V.F. and M.I.V.F. *Id.* at 161:15-162:7, 291:4-21.

18.     At some point on or about April 6, 2015, Vergara terminated the security protection assigned to Fuentes and the Children in Mexico.[4] *Id.* at 290:15-24, 292:2-8; *see also* Aug. 18, 2015, Tr. 172:13-173-11.  The Children had enjoyed such protection since they were born. *Id.* at 177:14-21.

19.     On April 8, 2015, Vergara filed a separation proceeding against Fuentes in Mexico City.  Aug. 17, 2015, Tr. 315:10-15; *see also* Appl. for Marital Separation, Pet'r Ex. 16.

20.     On that same day, Fuentes's former attorney in Mexico, Ismael Reyes Retana Tello ("Reyes"), met with Vergara at Vergara's home.  *See* Aug. 14, 2015, Dep. of Ismael Reyes Retana Tello 71:11-16[5] ("Reyes Deposition"), ECF No. 97.[6]  The purpose of the meeting was to

---

[4] At the hearing, Vergara conceded that he terminated the Children's security, but testified that he did not do so until the end of April 2015 when he was convinced the Children were not returning to Mexico.  *See* Aug. 17, 2015, Tr. 103:3-13.  In its role as fact finder, the Court does not credit this testimony.

[5] When citing to the Reyes Deposition, the Court uses the original pagination that appears in the deposition transcript.

try to resolve the parties' divorce amicably.  *Id.*

21.     A few days after the April 8, 2015, meeting, approximately 1,500 people identifying themselves as Omnilife employees protested in front of Reyes's law offices.  *Id.* at 58:15-59:6.  The protest was led by Vergara's cousin, Jose Vergara, and the protesters carried signs that said, "Corrupt Lawyers" and "Angelica, let us work."  *Id.*

22.     On April 9, 2015, Fuentes flew from Miami, Florida to her home in El Paso, Texas with the Children.  Aug. 17, 2015, Tr. 291:17-21.  On the advice of her counsel in Mexico, Fuentes decided to remain in the United States with the Children.  *Id.* at 293:13-294:6.

23.     On April 27, 2015, Vergara filed a petition for divorce in Mexico.  *Id.* at 73:22-25, 353:8-14; *see also* Lawsuit: No-Fault Divorce ("Divorce Petition"), Pet'r Ex. 19.  By the Divorce Petition, Vergara claimed for the first time that Fuentes was "not the [biological] mother of the minors," and instead gave birth to the Children via surrogacy (the "Surrogacy Allegations").  *See* Divorce Pet. ¶ III(a).  On this basis, Vergara sought to (1) terminate all of Fuentes's maternal rights, (2) remove any reference to Fuentes as the Children's mother from Mexico's national identity registration, and (3) prevent Fuentes from "hav[ing] any right to spend time with the minors."  *Id.* ¶¶ III(b)-(g).  He further requested a "restraining order [prohibiting Fuentes from] approaching or maintaining contact by any means with the minors."  *Id.* ¶ III(h).

24.     On May 5, 2015, Fuentes filed an answer to the Divorce Petition requesting that the Court award her temporary care and custody of the Children.  *See* Fuentes Answer to Divorce Petition at 000551, Pet'r Ex. 20.  In her answer, Fuentes further requested "temporary use of the

---

[6] Because Reyes was unavailable to testify during the hearing, the Court permitted each party to designate sections of his deposition for admission into the record.  The Court has reviewed Vergara's objections to the specific portions of Reyes's testimony cited below, and finds them all to be without merit.  Accordingly, they are overruled.

marital domicile" in Mexico City. *See id.*

25.     On May 7, 2015, the First Family Court of the Supreme Court of Justice of the Federal District in Mexico ("First Family Court") granted Fuentes provisional custody of the Children. *See* May 7, 2015, Order ("May 7 Order"), Pet'r Ex. 21. The First Family Court went on to state that Fuentes "must exercise" her temporary custody at the "marital domicile," and that within "three calendar days," Fuentes had to "state[] under oath the name of the school her minor children are attending, as well as the domicile thereof." *See id.*

26.     On June 4, 2015, Fuentes filed a suit affecting parent-child relationship ("SAPCR") in the 288th District Court in El Paso, Texas (the "Texas state court"). *See* Original Pet. in SAPCR ("SAPCR Petition"), Pet'r Ex. 25. Citing to the Surrogacy Allegations, Fuentes requested that the Texas state court appoint her as the Children's sole managing conservator and take measures to prevent Vergara from removing the Children from the United States to Mexico. *See id.* ¶¶ 5(a)-(c). Fuentes further requested that the Texas state court "identify[] the United States as the [Children's] country of habitual residence." *See id.* ¶ 5(d).

27.     Shortly thereafter, the Texas state court issued an order temporarily restraining Vergara from removing the Children from Fuentes's custody. *See* TRO, Order Granting Extraordinary Relief, and Order Setting Hr'g for Temporary Orders ("Texas TRO"), Pet'r Ex. 27.

28.     On June 8, 2015, the 24th Family Court of the Supreme Court of Justice of the Federal District in Mexico ("24th Family Court") awarded temporary care and custody of the Children to Vergara after finding that Fuentes was not residing in the Ruben Dario Apartment.

*See* June 8, 2015, Order at 000635 ("June 8 Order"), Pet'r Ex. 26.[7]  The 24th Family Court

ordered Fuentes to appear in Mexico City on June 15, 2015, to deliver the Children to Vergara.

*See id.* at 000637.

29.    Fuentes did not deliver the Children to Vergara as ordered, and instead appealed

the June 8 Order.[8]  *See* Fuentes Appeal of June 8 Order, Pet'r Ex. 29.

30.    On June 12, 2015, Vergara filed the instant action in this Court seeking the

Children's return to Mexico under the Convention.  *See* Verified Pet. for Return of Children

Under the Hague Convention ("Original Petition"), ECF No. 1.  Vergara repeated the Surrogacy

Allegations in his Original Petition.  *Id.* at 3.

31.    On June 18, 2015, Fuentes's counsel filed a constitutional challenge ("*juicio de

amparo*") in the 14th District Court in Civil Matters in the Federal District of Mexico (the

"Mexican Federal Court") on behalf of the Children.  *See* Lawsuit: Indirect Amparo ("Amparo

Petition"), Pet'r Ex. 30.  The Amparo Petition challenged the legality of the June 8 Order

awarding temporary physical care and custody of the Children to Vergara.  *See id.* at 004213.

The Amparo Petition further sought a "temporary suspension and, in due course, the final

suspension" of the June 8 Order requiring Fuentes to appear in the 24th Family Court and to

deliver the Children to Vergara.  *See id.* at 004228.

32.    On June 30, 2015, the Mexican Federal Court issued a "temporary suspension" of

the June 8 Order and set the matter for a subsequent hearing.  *See* June 30, 2015, Order at

004234 ("June 30 Order"), Pet'r Ex. 35.  As a condition of the suspension, the June 30 Order

---

[7] When citing to certain exhibits in the record, the Court's references to page numbers beginning with either "00" or "ATF" refer to the Bates numbers superimposed on those documents by the parties during the discovery process.

[8] To the best of the Court's knowledge, Fuentes's appeal of the June 8 Order remains pending.

required that Fuentes not alter her domicile from the Ruben Dario Apartment, and that she appear before the Mexican Federal Court in person with the Children every Monday.  *See id.*

33.    On July 7, 2015, the Mexican Federal Court issued a "definitive suspension" of the 24th Family Court's June 8 Order.  *See* July 7, 2015, Order at 004710 ("July 7 Order"), Pet'r Ex. 41.  In its July 7 Order, the Mexican Federal Court stated that the Children shall "remain with their mother" and not be "handed over to their father" or "placed at the disposal of the [24th Family Court]" "until the responsible authorities are made aware of the final resolution" of the Amparo Petition.  *Id.* at 004711.

34.    Based at least in part on Fuentes's submission of the Texas TRO, the Mexican Federal Court also removed the requirements in its June 30 Order that Fuentes reside in the Ruben Dario Apartment and appear in person with the Children every Monday.  *See id.* ("[T]he requirements that had been determined in the temporary suspension are hereby suspended.").

35.    Finally, the Mexican Federal Court instructed the 24th Family Court to send an official communication to the Texas state court in order to learn where Fuentes was living with the Children.  *Id.* at 004712.

36.    On July 23, 2015, Vergara appealed the Mexican Federal Court's July 7 Order.[9] *See* Mot. for Suspension, Pet'r Ex. 42.

37.    On August 13, 2015, the 24th Family Court granted Vergara's motion to dismiss the Surrogacy Allegations in the Divorce Petition with prejudice.  *See* Desisting from Further Action at 004771, Pet'r Ex. 43.  Previously, Vergara also removed any mention of the Surrogacy Allegations from his pleadings in this Case through the filing of his Amended Petition.  *Compare* Original Pet. 3, *with* Am. Pet. 3.

---

[9] To the best of the Court's knowledge, Vergara's appeal of the July 7 Order remains pending.

38.     Since April 1, 2015, Fuentes, Vergara, and Omnilife have engaged in extensive commercial litigation in Mexico and the United States.  *See* Aug. 17, 2015, Tr. 92:10-14, 94:14-19, 150:2-21; *see also* Aug. 18, 2015, Tr. 205:3-8.  Vergara has also personally filed at least two criminal proceedings against Fuentes in Mexico – one relating to the abduction of the Children, and one relating to Fuentes's alleged refusal to return certain of Vergara's personal items from the Ruben Dario Apartment.  Aug. 17, 2015, Tr. 106:19-107:9, 150:2-151:13.  Additionally, Omnilife has filed approximately seven criminal actions against Fuentes in Mexico.  *Id.* at 150:2-21; *see also* Aug. 18, 2015, Tr. 173:16-174:12.

39.     There has been extensive press and media coverage in Mexico regarding the ongoing lawsuits between Vergara and Fuentes, some of which has been initiated by Vergara's Mexican legal counsel.  *See* Aug. 17, 2015, Tr. 209:4-25, 211:13-24; Aug. 18, 2015, Tr. 154:2-24; *see also* Avacely Garza, *Angélica Fuentes Defrauded Jorge Vergara of 3 or 4 Billion Pesos*, Quien, May 5, 2015, http://www.quien.com/sociales/2015/05/05/abogado-angelica-fuentes-defraudo-a-jorge-vergara-por-3-o-4-mmdp, Resp't Ex. 9; Ciro Gómez, *Vergara and Coello Trejo Are Going to Kill Angélica Fuentes*, El Universal, May 7, 2015, http://www.radioformula.com.mx/notasimp.asp?Idn=500173, Resp't Ex. 11.

40.     Fuentes has received non-specific threats on Twitter from Chivas fans that blame her for the team's poor performance.  Aug. 17, 2015, Tr. 217:14-17, 221:13-22; *see also* May 29, 2015, Twitter Screenshot, Resp't Ex. 57.  The threats consist of statements such as, "your time's coming," and, "wait until you get yours."  Aug. 17, 2015, Tr. 221:13-22.

41.     At present, V.V.F. is five years old and M.I.V.F. is two years old.  *Id.* at 53:5-6.

II.     **CONCLUSIONS OF LAW**

In light of the foregoing findings, the Court makes the following conclusions of law.

A.      **The Hague Convention and ICARA**

The Hague Convention is an international treaty to which both the United States and Mexico are signatories.  *See Sanchez*, 761 F.3d at 500.  The Convention's purpose is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Convention, art. 1.  After the United States became a signatory in 1988, Congress implemented the Convention through legislation known as the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, formerly cited as 42 U.S.C. § 11601 *et seq.  See Abbott v. Abbott*, 560 U.S. 1, 5 (2010). ICARA's provisions are "in addition to and not in lieu of the provisions of the Convention."  22 U.S.C. § 9001(b)(2).

Under the Convention, when a court in a Contracting State determines that a person has taken a child across international borders in violation of another person's "rights of custody," the court must return the child to her country of habitual residence unless certain narrow exceptions apply.  *See id.* § 9001(a)(4); *Abbott*, 560 U.S. at 5.  The Convention speaks in terms of "wrongful retentions" and "wrongful removals."  *See* Convention, art. 3.  A child's removal to or retention in a State other than the child's country of habitual residence is considered "wrongful" where "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention," and "at the time of removal or retention those

11

rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.*; *see also Chafin v. Chafin*, --- U.S. ----, 133 S. Ct. 1017, 1021 (2013).

The return remedy is the Convention's "central operating feature." *Abbott*, 560 U.S. at 9. It is premised upon the principle that "the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Id.* at 20. In that vein, the return order "determines the country in which the custody decision is to be made; it does not make that decision." *Sanchez*, 761 F.3d at 503; *see also England v. England*, 234 F.3d 268, 271 (5th Cir. 2000) (noting that the return remedy is meant to "'restore the pre-abduction status quo'" (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II*"))). Indeed, courts are prohibited under the Convention from adjudicating the merits of the underlying custody dispute. *See Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004) (citing *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995)); *see also Berezowsky v. Ojeda*, 765 F.3d 456, 465 (5th Cir. 2014); *England*, 234 F.3d at 271.

While the Convention is silent on allocation and standards of proof, ICARA provides that the petitioner bears the initial burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained within the meaning of the Convention. 22 U.S.C. § 9003(e)(1)(A); *see also Sealed Appellant*, 394 F.3d at 342. The respondent, in turn, has the burden of establishing that one or more of the affirmative defenses listed in articles 12, 13, or 20 of the Convention apply to overcome the return remedy. 22 U.S.C. § 9003(e)(2); *see also Sealed Appellant*, 394 F.3d at 342. The standard of proof for these affirmative defenses is either preponderance of the evidence or clear and convincing evidence. 22 U.S.C. § 9003(e)(2).

### B.       Mootness

Before proceeding to the merits of the Amended Petition, the Court must address

Fuentes's contention that the July 7 Order moots the Case.  *See* Angélica Fuentes Téllez's

Proposed Findings of Fact and Conclusions of Law 9-16 ("Fuentes Brief"), ECF No. 100; *see*

*also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (holding that courts must

resolve challenges to their Article III jurisdiction before proceeding to the merits of a case).

According to Fuentes, because the July 7 Order "unequivocally grants [her] sole physical

custody . . . and does not limit where [she] can reside with the Children," an order returning the

Children to Mexico would "directly conflict[]" with the Mexican Federal Court's custody

determination.  *See* Fuentes Br. 10, 13.  As a result, Fuentes argues, "[n]either the return remedy

nor any other remedy is available to [Vergara] under the Hague Convention," and the Court must

therefore dismiss the Case as moot.  *Id.* at 11.

Article III of the United States Constitution restricts the power of federal courts to only

those matters that constitute "Cases" or "Controversies."  *See* U.S. Const. art. III, § 2, cl. 1; *see*

*also Already, LLC v. Nike, Inc.*, --- U.S. ----, 133 S. Ct. 721, 726 (2013).  Accordingly, in order

to invoke the jurisdiction of a federal court, "'a litigant must have suffered, or be threatened

with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial

decision.'"  *Chafin*, 133 S. Ct. at 1023 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477

(1990)).  "Federal courts may not 'decide questions that cannot affect the rights of litigants in the

case before them' or give 'opinions advising what the law would be upon a hypothetical state of

facts.'"  *Id.* (quoting *Lewis*, 494 U.S. at 477) (alteration removed).  "The 'case-or-controversy

requirement subsists through all stages of federal judicial proceedings, trial and appellate.'"  *Id.*

13

(quoting *Lewis*, 494 U.S. at 477).  Thus, "it is not enough that a dispute was very much alive when suit was filed; the parties must continue to have a personal stake in the ultimate disposition of the lawsuit."  *Id.* (internal quotation marks and citation omitted, alteration removed). However, a case is moot only where "'it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"  *Id.* (quoting *Knox v. Serv. Employees Int'l Union, Local 1000*, --- U.S. ----, 132 S. Ct. 2277, 2287 (2012)).  Stated another way, "'[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'" *Id.* (quoting *Knox*, 132 S. Ct. at 2287).

In her supporting brief, Fuentes principally relies upon a decision from the Tenth Circuit which addressed the question of whether a new custody order from a court of proper jurisdiction could moot a parent's appeal under the Convention.  *See Navani v. Shahani*, 496 F.3d 1121 (10th Cir. 2007).  In *Navani*, the district court granted a father's Hague petition and ordered the child returned to England, the child's country of habitual residence, based on its finding that the mother wrongfully retained the child in the United States without the father's consent.  *Id.* at 1124-25.  Although the mother promptly returned the child to England, she appealed the district court's decision to the Tenth Circuit.  *Id.* at 1125.  During the pendency of the mother's appeal, the English family court with jurisdiction over the child's custodial arrangements issued a new custody order which stated that the child "shall reside with the father" and that the mother could have "no direct contact [with] the child . . . outside the jurisdiction of England and Wales."  *Id.* at 1124, 1126.  Shortly thereafter, the father moved to dismiss the mother's appeal on mootness grounds.  *Id.* at 1126.  In particular, the father contended that the Tenth Circuit could not grant the mother any effectual relief without violating the express terms of the English family court's

14

custody order.  *Id.*

The Tenth Circuit agreed.  *Id.* at 1127.  In dismissing the mother's appeal as moot, the court reasoned that even if it were to find as the mother requested – that the district court erred in ordering the child returned to England – "the only way to remedy the error would be to order [the child's] return to the United States to be reunited with [the mother]."  *Id.*  However, because it was undisputed that England was the child's country of habitual residence, and because the English family court had entered a final custody order implicitly forbidding the child's return to the United States, the Tenth Circuit found that it could not grant the mother any relief whatsoever in connection with her Hague appeal.  *Id.* at 1127-28.

Fuentes contends that the custody situation in this Case is materially identical to the situation that the Tenth Circuit confronted in *Navani* – that is, that in both cases, one parent has permanent custody over the children pursuant to a valid order from the children's country of habitual residence, and that, in both cases, the court cannot order any effectual relief whatever to the other parent without violating the express terms of the new operative custody order.  *See* Fuentes Br. 12-13.  While this argument has some logical appeal, it ultimately fails because the July 7 Order does not do what Fuentes says it does – namely, grant Fuentes final and permanent custody of the Children, and thereby "implicitly prohibit" this Court from ordering the Children returned to Mexico.  *See* Aug. 17, 2015, Tr. 21:22-25 (Fuentes's counsel characterizing the July 7 Order as a "final and permanent" custody order), 23:20-23 (same), 25:13-16 (Fuentes's counsel claiming that "it's [clear] on its face" that the July 7 Order is a "final order in Mexico giving [Fuentes] custody of these children"), 69:22-70:1 (same), 393:17-21 (Fuentes's counsel characterizing the July 7 Order as the "final expression" of the parties' custodial rights); *see also*

Aug. 18, 2015, Tr. 8:15-18, 14:9-13.

Because the parties sharply disagree as to the meaning and legal effect of the July 7 Order, the Court pauses to discuss the nature of *amparo* actions generally before proceeding with its analysis.[10]  During the hearing, the Court received testimony from two Mexican law experts: Eduardo Bustamante ("Bustamante"), who testified on behalf of Vergara, and Habib Diaz Noriega ("Diaz"), who testified on behalf of Fuentes.  Bustamante provided the Court with a general background as to the nature of *amparo* proceedings in Mexico.  *See* Aug. 17, 2015, Tr. 348:9-349:4.  According to Bustamante, "*amparo*" is a Mexican constitutional procedure upon which an individual may obtain injunctive relief from a Mexican federal court invalidating any government action taken in violation of the individual's human rights under Mexican law.  *Id.* at 348:9-22.  Bustamante compared the Mexican federal district court's role in an *amparo* proceeding to that of an "umpire," in that the court's sole task is to determine whether the relevant government action is illegal, and if so, to provide the individual with federal protection by granting the *amparo*.  *Id.* at 348:22-349:2.

Diaz did not dispute Bustamante's general description of *amparo* proceedings; he did, however, provide some additional information that is relevant to this Court's understanding of the July 7 Order.  *See generally* Aug. 18, 2015, Tr. 92:28-111:2.  According to Diaz, when an *amparo* petition is filed, it follows two parallel tracks:  "One is dealing with the . . . immediate protection for the private entity or individual that is seeking this relief, and [the other] is dealing with a violation to [the individual's] human rights."  *Id.* at 96:17-23.  Stated differently, the first

---

[10] Under Federal Rule of Civil Procedure 44.1, the Court may determine foreign law by considering "any relevant material or source, *including testimony*, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1 (emphasis added).  Consistent with this provision, the Court relies on the testimony of Mexican law experts Eduardo Bustamante and Habib Diaz Noriega in interpreting the legal effect of the July 7 Order.

"track" is whether the offending state action will be stayed pending the outcome of the petition,
and the second is the actual merits of the petition – *i.e.*, whether the state action violated the
individual's human rights. *See id.* at 96:17-23, 99:24-100:16, 100:18-101:5, 102:4-103:25.

       With this understanding and background, the Court concludes that the July 7 Order does
not moot the Case. Unlike the English family court in *Navani*, which the Tenth Circuit noted
had "plenary jurisdiction over [the child's] custody," *see* 496 F.3d at 1129, the Mexican Federal
Court's July 7 Order is not a "final custody order." Indeed, both experts testified that the
Mexican Federal Court's only task with respect to the merits of the Amparo Petition is to
determine whether the 24th Family Court's June 8 Order violates the Children's human rights.
*See, e.g.*, Aug. 17, 2015, Tr. 393:22-394:2; Aug. 18, 2015, Tr. 100:22-101:5. The July 7 Order
does not even reach the substance of this legal question; it merely issues a "definitive
suspension" of the 24th Family Court's order "until the responsible authorities are made aware of
the final resolution issued in the protection/appeals trial ('Juicio de Amparo'), *from which this
suspension incident derives*." *See* July 7 Order at 004710 (emphasis added). In other words, the
July 7 Order arises under the first "track" that Diaz discussed during his testimony – it
permanently stays the June 8 Order, and finds that the Children shall "remain with their mother"
and not "be handed over to their father" or be "placed at the disposal of the Twenty-Fourth
Family Court" until such a time as the Mexican Federal Court has ruled on the merits of the
Amparo Petition. *See id.* at 004711. Diaz conceded as much during his testimony, *see* Aug. 18,
2015, Tr. 86:25-87:6, and further admitted during cross examination that the 24th Family Court –
and not the Mexican Federal Court – is the judicial body that will ultimately determine the

parent's custodial rights regarding the Children.[11]  *Id.* at 110:20-111:2.

Moreover, while Fuentes is correct that the July 7 Order suspends any and all geographical limitations on where she may exercise temporary physical custody over the Children, *see* July 7 Order at 004711, the *absence* of geographical limitations does not render the Convention's return remedy unavailable to Vergara.  Indeed, there is no language in the July 7 Order *prohibiting* Fuentes from residing with the Children in Mexico, nor is there any language in the Convention or ICARA requiring the Court to transfer custody to the left-behind parent upon ordering a child returned to his or her country of habitual residence.  Thus, Fuentes's contention that a return order would "directly conflict[] with the July 7 Order" is simply not true. *See* Fuentes Br. 13.

Finally, the Court observes that the situation in the instant case differs from that in *Navani* in one other critical respect:  while the parents in *Navani* both agreed that England was their child's country of habitual residence, *see* 496 F.3d at 1129, here, Fuentes expressly does *not* concede that Mexico is the proper jurisdiction to litigate custody, contending instead that "the Children have dual habitual residences [as they] reside in both the United States and Mexico."

---

[11] Perhaps in recognition that the evidence at the hearing did not bear out her initial characterizations of the July 7 Order, Fuentes cites to *Shealy v. Shealy*, 295 F.3d 1117 (10th Cir. 2002), for the proposition that a provisional custody order can still moot a Hague Convention case.  *See* Fuentes Br. 14-16.  In *Shealy*, the Tenth Circuit gave deference to a German appellate court's finding that the mother did not wrongfully remove her child from Germany to the United States pursuant to a provisional German custody order that was in effect at the time of removal.  *Id.* at 1123-24.  The Tenth Circuit's reasoning confirms that the decision is simply an application of the general principle that courts must look to the parents' custodial rights at the time of removal, as interpreted by the courts of the country of habitual residence, to determine whether the removal was wrongful under the Convention.  *See id.*; *see also, e.g.*, *White v. White*, 718 F.3d 300, 307 (4th Cir. 2013) (collecting cases on this principle, including *Shealy*).  The *Shealy* court did not even discuss mootness, and its holding certainly does not support Fuentes's argument that a temporary custody order issued *after* removal or retention is sufficient to moot a left-behind parent's Hague petition.  Indeed, such a holding would be directly inconsistent with the avowed purpose of the Convention, which is to "'restore the *pre-abduction* status quo.'"  *England*, 234 F.3d at 271 (quoting *Friedrich II*, 78 F.3d at 1064) (emphasis added).  This is especially true here, where in just a five month period, three different Mexican courts have issued four different provisional orders shifting temporary physical custody of the Children from Fuentes, back to Vergara, and then finally back to Fuentes.  *See* May 7 Order; June 8 Order; June 30 Order; July 7 Order.

Fuentes Br. 17-18.  The possibility of the parties litigating custody across national borders is not merely theoretical; it has been occurring since this Case's inception.  On June 4, 2015, Fuentes filed a SAPCR Petition in Texas state court.  *See* SAPCR Pet.  Just four days later, Fuentes obtained the Texas TRO which effectively granted her provisional custody of the Children pending a preliminary injunction hearing.  *See* Texas TRO.  While the parties initially agreed not to pursue the Texas state court litigation until after the resolution of this Case,[12] Fuentes has shown no indication that she intends to abandon her SAPCR Petition.  Indeed, quite the opposite: Fuentes formally served Vergara with process in the Texas state court proceeding on the morning of the August 17, 2015, hearing.  *See* Aug. 18, 2015, Tr. 227:24-228:2.  As a result, if this Court were to dismiss the Case as moot, as Fuentes requests, it "would create the [very] evil that the Hague Convention was intended to prevent: dueling custody orders issued by separate national courts."  *See Navani*, 496 F.3d at 1130.

In sum, because the July 7 Order is a provisional custody order that neither terminates Vergara's custody rights nor prohibits Fuentes from residing with the Children in Mexico, and because the parties are currently litigating custody in two different national forums, the Court finds that a live case or controversy presently exists, and the Court therefore has subject matter jurisdiction to consider the merits of Vergara's Amended Petition.  *See Chafin*, 133 S. Ct. at 1023.

### C.    Vergara's Case Under the Hague Convention

As noted above, Vergara bears the initial burden of proving by a preponderance of the evidence that Fuentes's removal or retention of the Children was wrongful.  *See* 22 U.S.C. §

---

[12] *See* June 26, 2015, Order, ECF No. 37 ("[T]he parties agree that all proceedings and actions . . . in the District Court of El Paso County, Texas, 388th Judicial District, are abated pending final judgment on the merits of this proceeding.").

9003(e)(1); *see also Sealed Appellant*, 394 F.3d at 342.  The Fifth Circuit has held that a prima

facie case under the Convention and ICARA consists of three elements.  *See Larbie v. Larbie*,

690 F.3d 295, 307 (5th Cir. 2012).  "First, the petitioner must show that the respondent removed

or retained the child somewhere other than the child's habitual residence."  *Id.*  "If so, the

question becomes whether the removal or retention violated the petitioner's 'rights of custody'

under the habitual-residence nation's laws."  *Id.*  Finally, "[a]ssuming that the petitioner has

rights of custody, [he] then need only make the final, and relatively easy, showing that at the

time of removal or retention those rights were actually exercised, either jointly or alone, or

would have been so exercised but for the removal or retention."  *Id.* (all internal quotation marks

and citations omitted).  The Court discusses each of these elements in turn.

### 1.    Country of habitual residence

Vergara argues that the evidence overwhelmingly establishes that the Children's country

of habitual residence is in Mexico, where both he and Fuentes are citizens.  *See* Pet'r's

Supporting Br. 4-7 ("Vergara Brief"), ECF No. 99.  Fuentes responds that the Children were

born in the United States, hold dual Mexican-American citizenship, and have spent the majority

of their lives alternating between living in the United States and Mexico.  Fuentes Br. 17-18.  As

a result, Fuentes contends that the Children have "dual habitual residences," and thus "removal

of the Children from the United States to Mexico is an inappropriate remedy under the Hague

Convention."  *Id.* at 18.

"'The inquiry into a child's habitual residence is not formulaic; rather it is a fact-

intensive determination that necessarily varies with the circumstances of each case.'"  *Larbie*,

690 F.3d at 310 (quoting *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)).  "At core,

however, the inquiry balances the interests of the child, who is the ultimate focus of the Convention, and the intentions of its parents, who usually effect the removal or retention giving rise to a Convention petition." *Id.*

In this circuit, courts determine a child's country of habitual residence by looking primarily to the parents' "shared intent" or "settled purpose." *Id.* "This approach does not ignore the child's experience, but rather gives greater weight to the parents' subjective intentions relative to the child's age." *Id.* Importantly, the Fifth Circuit has found that the "parents' intentions should be dispositive where, as here, the child is so young that 'he or she cannot possibly decide the issue of residency.'" *Id.* (quoting *Whiting*, 391 F.3d at 548-49). In such a case, "the threshold test is whether both parents intended for the child to abandon the habitual residence left behind." *Id.* (internal quotation marks and citation omitted, alterations removed). Put differently, establishing a new residence for a child requires "the parents [to] reach some sort of meeting of the minds regarding their child's habitual residence, so that they are making the decision together." *Berezowsky*, 765 F.3d at 465.

In her supporting brief, Fuentes cites a case from the Ninth Circuit that suggests – but does not hold – that a child could theoretically have "dual habitual residences" under the Convention. *See Mozes v. Mozes*, 239 F.3d 1067, 1084 n.50 (9th Cir. 2001) (speculating that a child who spent alternating periods with each parent in different countries pursuant to a shared custody arrangement "might" acquire dual habitual residences under the Convention); *see also id.* at 1076 n.17 (recognizing "the rare situation where someone consistently splits time more or less evenly between two locations, so as to retain alternating habitual residences in each"). While the Fifth Circuit has yet to directly confront this issue, the analytical framework it has

21

adopted for determining habitual residence casts significant doubt on the idea that a child could habitually reside in more than one place at the same time. *See Berezowsky*, 765 F.3d at 466 (noting that the test in this circuit for whether a child developed a new habitual residence is if "'both parents intended for the child to *abandon* the habitual residence left behind'" (quoting *Larbie*, 690 F.3d at 310-11)) (emphasis added, alteration removed). Moreover, the Sixth Circuit has expressly stated, albeit in dicta, that "[a] person can have only one habitual residence." *See Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("*Friedrich I*"). Other courts, including some district courts in this circuit, have cited this language from *Friedrich I* approvingly. *See Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) (quoting *Friedrich I*, 983 F.2d at 1401); *see also Martin v. Moquillaza*, No. 4:14-CV-446, 2014 WL 3924646, at *4 (E.D. Tex. Aug. 8, 2014) (same); *Stewart v. Marrun*, No. 4:09CV141, 2009 WL 1530820, at *2 (E.D. Tex. May 29, 2009) (same); *Clausier v. Mueller*, No. 4:03-CV-1467-A, 2004 WL 906514, at *1 (N.D. Tex. Apr. 27, 2004) (same).

The facts of this Case do not require the Court to resolve this issue, as even assuming a child could theoretically have dual habitual residences, there is no evidence that either Vergara or Fuentes intended for the Children to reside anywhere but Mexico. As an initial matter, it is undisputed that Vergara is a Mexican citizen who has resided continuously in Mexico for his entire adult life. That trend continued after he and Fuentes married in August 2008. During the initial years of V.V.F.'s life, the family resided almost continuously[13] in Guadalajara, Mexico. After M.I.V.F. was born, Fuentes and Vergara eventually moved with the Children to Mexico

---

[13] For a six-month period straddling M.I.V.F.'s birth, Fuentes, Vergara, and V.V.F. resided in Fuentes's home in El Paso, Texas. Aug. 17, 2015, Tr. 64:5-8. As noted above, this extended stay was due to pregnancy complications, and is therefore not indicative of any intent to make El Paso, Texas the Children's permanent home. *See id.* Indeed, a few months after M.I.V.F.'s birth, the entire family returned to Guadalajara, Mexico. *Id.* at 57:25-58:9, 64:9-18.

City, and thereafter resided in the Ruben Dario Apartment.  During this time, Fuentes and Vergara jointly enrolled the Children in a pre-school in Mexico City, and also enrolled the Children in various extracurricular activities, such as ballet, gymnastics, horseback riding, swimming, and French lessons.  The family continued to reside in the Ruben Dario Apartment up until April 2015, when Vergara removed Fuentes as CEO of Omnilife.  In short, although it is undisputed that the Children spent substantial time traveling in the United States, there is simply no basis in the record to conclude that Vergara ever *intended* to make the United States V.V.F.'s or M.I.V.F.'s country of habitual residence. *See, e.g.*, Aug. 17, 2015, Tr. 131:1-14 (Vergara expressly denying that he ever so intended during his direct examination testimony).

Nor is there evidence that Fuentes herself formed such an intention prior to April 2015. While the Children frequently accompanied Fuentes when she traveled to various locations within the United States, Fuentes conceded that these trips always concluded with her and the Children returning to their home in Mexico. *See* Aug. 18, 2015, Tr. 203:18-204:6.  Moreover, although Fuentes maintained at the hearing that El Paso, Texas, is where she and the Children feel most comfortable, *see id.* at 184:14-185:3, it is undisputed that Fuentes renounced her United States citizenship six months *after* she purchased the home in El Paso, Texas where she and the Children now reside. *Compare* Aug. 17, 2015, Tr. 262:11-14 (Fuentes testifying that she renounced her United States citizenship on March 15, 2011), *with* Special Warranty Deed (executed September 27, 2010).  This is strong evidence that Fuentes never intended to make El Paso, Texas her permanent home, let alone the permanent home of her two Children.  Finally, the Court notes that Fuentes has consistently represented to the United States government for tax purposes that Mexico is her "regular or principal permanent home," and that her family is located

23

in Mexico.  *See* Fuentes 2011-2014 Tax Returns at ATF 000737, ATF 001080, ATF 001133,

ATF 001194, Resp't Ex. 56.  Given Fuentes's legal representations, as well as her decision to

renounce her United States citizenship six months after she purchased a home in El Paso, Texas,

the Court finds that Fuentes never developed the intention for the Children to reside in the United

States prior to April 2015.  There is no evidence that either parent *separately* developed an

intention for V.V.F. or M.I.V.F. to reside in the United States; and there is certainly no evidence

of *shared* parental intent, as required to develop a new habitual residence under the Convention.

*See Larbie*, 690 F.3d at 310-11.

In sum, the Court finds that the parties' last and only shared intent was for the Children to

reside in Mexico City.  As a result, Mexico is the Children's country of habitual residence, and

Vergara has therefore satisfied the first element of his prima facie case.  *See id.*

### 2.    Rights of custody

Having concluded that Mexico is both V.V.F.'s and M.I.V.F.'s country of habitual

residence, the Court must now decide whether Fuentes's removal of the Children from Mexico

or her retention of them in the United States was "wrongful" under the Convention.  *See id.* at

307.  To meet this burden, Vergara must first establish that "the removal or retention violated

[his] 'rights of custody' under the habitual-residence nation's laws."  *See id.*; *see also*

Convention, art. 3(a).

Vergara argues that his rights of custody arise under Mexican law by virtue of his

fatherhood.  Vergara Br. 8.  He further contends that none of the provisional orders in Mexico or

in the United States are relevant because the Court must look to the parties' custodial rights as

they existed at the time of removal.  *Id.*  Fuentes does not appear to dispute that Vergara

24

possessed rights of custody under Mexican law at the time of removal.  *See* Fuentes Br. 18

(acknowledging that, "absent a court order to the contrary, [both parents] share physical custody

over the Children").  Notwithstanding this concession, however, Fuentes argues that her actions

did not breach Vergara's rights of custody because neither the May 7 Order nor the June 30

Order expressly prohibited her from taking the Children to the United States.  *Id.*  She further

argues that her actions are "entirely consistent" with Vergara's custody rights because the parties

have always been frequent international travelers and because Fuentes has allowed Vergara to

visit with the Children while they have been living in El Paso.  *Id.* at 19.

       As a threshold matter, the Court has reservations about labeling Fuentes's post-April

2015 conduct as "wrongful" under the Convention.  It is undisputed that Fuentes left Mexico

City with the Children on April 1, 2015, on a pre-planned vacation.  Once she arrived in Punta

Mita, Mexico, it appears to this Court that Vergara did everything within his considerable power

to make it extremely difficult for Fuentes to return to Mexico City with the Children.  First, the

Court received credible evidence that on or about April 6, 2015, Vergara terminated the armed

security team assigned to Fuentes and the Children in Mexico City.  Shortly thereafter, Vergara

and Omnilife began filing numerous criminal proceedings against Fuentes, including one in

which Vergara claimed that Fuentes was criminally liable for failing to return certain of his

personal possessions in the Ruben Dario Apartment.  Finally, on April 27, 2015, Vergara filed

the Divorce Petition in which he claimed for the very first time that Fuentes was not the

biological mother of the Children, and sought to terminate Fuentes's relationship with the

Children on the basis of these allegations.  While the Court has no doubt that Fuentes possesses

the financial wherewithal to mount a vigorous legal defense as to all of these allegations, her

decision to remain in El Paso, Texas hardly seems unreasonable given the scope and character of Vergara's conduct.

Nevertheless, the Convention uses the terms "wrongful removal" and "wrongful retention" as terms of art, and neither requires (or even allows for) the Court to weigh the relative reasonableness of the parties' actions.  *See* Convention, art. 3; *Larbie*, 690 F.3d at 307 (noting that the phrase "wrongful removal or retention" is defined by the Convention); *see also Berezowsky*, 765 F.3d at 465 ("When evaluating a Hague Convention claim, we do not assess the merits of the underlying custody dispute.").  Instead, the immediate question before the Court is simply whether Fuentes's retention of the Children in El Paso, Texas violated Vergara's rights of custody under the laws of the Federal District of Mexico.  *See* Convention, art. 3.

With this clarification, the Court proceeds with its analysis.  Under the Convention, "rights of custody" are defined as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Convention, art. 5(a).  A parent's custody rights "need not be enshrined in a formal custody order issued before the removal or retention" in order to be actionable; they may instead arise either by agreement or by operation of law.  *Larbie*, 690 F.3d at 307.  Given the Convention's goal of restoring the pre-abduction status quo, "the only reasonable reading of the Convention is that a removal's wrongfulness depends on rights of custody *at the time of removal*."  *White v. White*, 718 F.3d 300, 306-07 (4th Cir. 2013) (collecting cases).[14]

Because there is no indication that a valid court order or enforceable agreement governed

---

[14] While *White* discussed this rule in the context of a wrongful removal, this Court agrees that "the logic of its holding continues into wrongful retention cases."  *Slight v. Noonkester*, No. CV 13-158-BLG-SPW, 2014 WL 282642, at *6 (D. Mont. Jan. 24, 2014).  Here, because Fuentes was in Miami, Florida with the Children in accordance with a pre-planned vacation, the Court focuses its analysis on whether Fuentes's retention of the Children in the United States was "wrongful" under the Convention.

the parties' custodial rights at the time Fuentes first retained the Children in the United States,

Vergara's rights of custody arose either by operation of law, or not at all. *See Sealed Appellant*,

394 F.3d at 343 (citing Convention, art. 3). To make this determination, the Court applies the

laws of the Federal District of Mexico City because that is where the Children habitually resided

immediately prior to their removal. *See* Convention, art. 3 (ordering Contracting States to

determine "breaches of rights of custody" by applying "the law of the State in which the child

was habitually resident immediately before the removal or retention"), art. 31(b) (clarifying that

"any reference to the law of the State of habitual residence shall be construed as referring to the

law of the territorial unit in that State where the child habitually resides"); *see also Saldivar v.

Rodela*, 879 F. Supp. 2d 610, 623 (W.D. Tex. 2012) (analyzing parent's rights of custody under

the civil code of Chihuahua, Mexico because that is where the minor child resided immediately

prior to the alleged unlawful removal).

According to Bustamante, whose testimony this Court credits, the Federal District of

Mexico adheres to the doctrine of *patria potestas* – a generalized concept of parental authority

embodied in Mexico's civil code. *See* Aug. 17, 2015, Tr. 381:11-382:15; *accord Gatica v.

Martinez*, No. 10-21750-CIV, 2010 WL 6744790, at *5 (S.D. Fla. Oct. 13, 2010) (noting that the

Federal District of Mexico adheres to the *patria potestas* doctrine), *report and recommendation

adopted by* 2011 WL 2110291 (S.D. Fla. May 25, 2011). Under the *patria potestas* doctrine,

each parent has certain rights and obligations relating to the physical, mental, moral, and social

upbringing of their child. *See Whallon v. Lynn*, 230 F.3d 450, 457 (1st Cir. 2000) (*Whallon I*)

(providing a comprehensive discussion of the origins and evolution of the *patria potestas*

doctrine in Mexico, including the rights and duties attributable to both parents); *Saldivar*, 879 F.

27

Supp. 2d at 623-26 (same).  This means that, absent a court order abolishing one parent's *patria potestas* rights, both parents effectively exercise joint custody over their minor children.  *Castro v. Martinez*, 872 F. Supp. 2d 546, 555 (W.D. Tex. 2012) ("Pursuant to [the *patria potestas* doctrine[,] both parents have joint custody rights.").  Because Fuentes has not pointed to any court order in Mexico abolishing Vergara's *patria potestas* rights, the Court finds that Vergara possessed "rights of custody" by operation of Mexican law at the time Fuentes first retained the Children in the United States.  *See Altamiranda Vale v. Avila*, 538 F.3d 581, 586 (7th Cir. 2008) ("By virtue of the doctrine of *patria potestas*, Vale, the father, had rights relating to the care of the person of the child . . . .  No more is necessary to establish that Vale had 'rights of custody,' which Avila infringed."); *Whallon I*, 230 F.3d at 459 (holding that rights conferred pursuant to *patria potestas* are "custody rights," as defined by the Convention); *Castro*, 872 F. Supp. 2d at 555 (same).

Fuentes's arguments pertaining to the May 7 and June 30 Orders do not compel an alternative result.  *See* Fuentes Br. 18.  As an initial matter, both of these orders are provisional in nature, and neither even references, let alone abolishes, Vergara's *patria potestas* rights.  *See generally* May 7 Order; June 30 Order; *see also* Aug. 17, 2015, Tr. 382:9-15 (Bustamante testifying that a court order "would be the only legal or lawful way" for a parent to lose the custody rights conferred by the *patria potestas* doctrine).  However, even setting this fact aside, Fuentes's argument still fails because the Convention requires courts to analyze whether a removal or retention violated a left-behind parent's rights of custody *at the time of the removal or retention*.  *See White*, 718 F.3d at 306-07.  Accordingly, even assuming Fuentes could invoke the terms of some subsequent court order to justify her retention of the Children in El Paso,

Texas, that justification would be of no moment to the merits of Vergara's Amended Petition. *See id.* at 307 (collecting cases from foreign signatory courts rejecting the argument that so-called "chasing orders" affect custody rights under Article 3 of the Convention).

Fuentes's final argument – that her retention of the Children in the United States is "entirely consistent" with Vergara's rights of custody – is also without merit. *See* Fuentes Br. 19. Indeed, while it may be true that Fuentes and Vergara agreed early on "that the Children would live a multi-cultural life," *see id.*, this understanding does not authorize Fuentes to unilaterally change the Children's country of habitual residence without Vergara's input or consent. If it did, the Convention's applicability would turn on the frequency of a child's international travel habits.

In sum, because Vergara possessed rights of custody under applicable Mexican law, and because Fuentes retained the Children in the United States over Vergara's objections, the Court finds that Vergara has satisfied his burden as to the second element of his prima facie case. *See Larbie*, 690 F.3d at 307.

### 3. Exercising Rights of Custody

The final element that Vergara must prove to establish a prima face case of wrongful retention is the "relatively easy" showing "that at the time of removal or retention those rights [of custody] were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *See id.* (internal quotation marks and citations omitted). Adopting the reasoning of the Sixth Circuit, the Fifth Circuit has indicated that once a court finds that a left-behind parent has rights of custody, "'that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of

29

the child." *See Sealed Appellant*, 394 F.3d at 345 (quoting *Friedrich II*, 78 F.3d at 1066) (emphasis removed).

Here, Fuentes does not argue that Vergara has committed any acts that constitute a clear and unequivocal abandonment of the Children. *See* Fuentes Br. 18-19. The Court finds that there is wisdom to this concession, as there is simply no colorable argument that Vergara was not exercising his rights of custody at the time Fuentes initially retained the Children in the United States. As a result, Vergara has successfully established all elements of his prima face case, and is entitled to the Children's return to Mexico, unless Fuentes establishes one of the Convention's affirmative defenses. *See, e.g.*, *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006); *Saldivar*, 879 F. Supp. 2d at 627.

### D.       Fuentes's Grave Risk Affirmative Defense

Under Article 12 of the Convention, once a court finds that a parent has wrongfully removed or retained a child, it must order the child's return unless the removing parent establishes one of four affirmative defenses available under the Convention. *See England*, 234 F.3d at 270 (citing Convention, art. 12). Here, Fuentes invokes one such defense by claiming that returning the Children to Mexico would expose them to grave risks of physical and psychological harm. *See* Fuentes Br. 19-23; *see also* Convention, art. 13(b).[15]

"Article 13 of the Convention provides an exception to Article 12's rule of mandatory return in the event of 'a grave risk that the child's return would expose the child to physical or

---

[15] Although Fuentes pleaded the existence of three other affirmative defenses in her most recent answer – namely, the well-settled defense, the consent or acquiescence defense, and the fundamental principles of human rights defense – the sole exception she pursued at the hearing, and in her court briefing, was that return would expose the Children to a grave risk of physical or psychological harm. *See generally* Fuentes Br. Given that Fuentes bears the burden of proof on all affirmative defenses under the Convention, her failure to pursue these defenses at the hearing is alone grounds to dismiss them under the Convention. *See* 22 U.S.C. § 9003(e)(2).

psychological harm or otherwise place the child in an intolerable situation.'" *England*, 234 F.3d at 270 (quoting Convention, art. 13(b)) (alteration removed).  As with all of the affirmative defenses under the Convention, the grave-risk-of-harm defense is "narrow."  22 U.S.C. § 9001(a)(4).  It requires the removing parent – in this Case, Fuentes – to prove the existence of such a grave risk by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).  Moreover, even if Fuentes carries this burden, "a federal court has 'and should use when appropriate' the discretion to return a child to his or her place of habitual residence 'if return would further the aims of the Convention.'"  *England*, 234 F.3d at 271 (quoting *Friedrich II*, 78 F.3d at 1067).

In her supporting brief, Fuentes identifies three categories of threats to the Children's physical and emotional well-being that she asserts satisfy the grave-risk-of-harm exception.  *See* Fuentes Br. 19-23.  First, Fuentes argues that the "inherent danger in and around Mexico City" combined with Vergara's "vicious [media] campaign" against her has made the Children "prime target[s] for kidnapping" and ignited the passions of the Chivas soccer fans, as evidenced by various death threats Fuentes has received on social media.  *Id.* at 20-22.  Second, Fuentes asserts that Vergara's ongoing effort to ensure that she is sent away to prison creates a grave risk of harm to the Children's psychological well-being.  *Id.* at 22-23.  And third, Fuentes claims that the Surrogacy Allegations, which she acknowledges have been withdrawn with prejudice, nonetheless create the possibility "of a third party challenge to [her] maternal rights."  *Id.* at 22.

Responding to Fuentes's arguments in turn, Vergara notes that Fuentes's own security expert could not identify any direct or imminent threat to either Fuentes or the Children when questioned on cross examination.  Vergara Br. 12-13.  He further argues that, under the Convention, a threat of criminal prosecution to a *parent* is insufficient to create a grave risk of

31

harm to the *child* – especially where, as here, the parent is represented by numerous highly-skilled lawyers. *Id.* at 14-15.  Finally, Vergara contends that Fuentes's "suggestion that an unknown third party, presumably the anonymous egg donor, could pursue [the Surrogacy Allegations] is complete speculation." *Id.* at 11.

Because Fuentes's grave risk defense was the subject of significant testimony during the hearing, the Court addresses each of Fuentes's contentions separately.  First, as to Fuentes's generalized security concerns, the Court credits the testimony of Fuentes's security expert, Larry Villalobos ("Villalobos"), that Mexico can be a dangerous place for the children of wealthy individuals, and that the security risk to V.V.F. and M.I.V.F. is enhanced by the recent media exposure surrounding Fuentes's departure from Omnilife.  *See* Aug. 17, 2015, Tr. 211:13-212:25, 216:25-218:23, 219:3-220:10, 220:25-221:15.  However, this testimony is insufficient to establish by clear and convincing evidence that returning the Children to Mexico would expose them to a "grave risk."  Both Fuentes and Vergara were commonly known in the Mexican public as wealthy individuals well-before their April 2015 separation.  During this time, the Children lived their entire lives under extensive security protection in Mexico.  *See* Aug. 18, 2015, Tr. 177:14-21.  Neither Villalobos nor any other witness testified that these same security measures would be inadequate to address the increased security risk caused by the recent media attention.  This omission is significant, given Fuentes's testimony that she is willing and able to provide the Children with whatever security is necessary if they are ultimately returned to Mexico.  *See* Aug. 17, 2015, Tr. 296:1-5.  Similarly, though Vergara maintained that the Children do not actually need security protection, *see id.* at 169:2-8, he also testified that he is willing to provide it if the Children are returned in accordance with the Convention.  *Id.* at 103:18-20.  Thus, because both

parents are willing and able to provide the Children with the same security protection that they had prior to April 2015, and because there is no basis to conclude that these security measures would be in any way inadequate to confront the threats Villalobos discussed during his testimony, the Court finds that return would not expose the Children to a grave risk of physical harm.[16]

Fuentes's fear of criminal prosecution in Mexico is also insufficient to overcome the Convention's return remedy.  While the Court does not go as far as to hold that such evidence could never, under any circumstances, constitute a grave risk of psychological harm to a child, the Court is confident that in this Case, Fuentes is more than capable of defending herself against criminal charges in Mexico.  Moreover, because the Court has no information on the merits of these criminal allegations, it would be inappropriate for the Court to condition the Children's return to Mexico on their dismissal.[17]  *Cf. Kufner v. Kufner*, 480 F. Supp. 2d 491, 513-15 (D.R.I. 2007) (requiring father to secure the dismissal of all criminal charges against mother in Germany as a condition to the child's return from the United States), *aff'd*, 519 F.3d 33 (1st Cir. 2008).

Finally, the Court addresses Fuentes's argument regarding the Surrogacy Allegations. This Court is of the opinion that a very close question exists as to whether Vergara's professed desire to terminate Fuentes's maternal rights on the basis that she is not genetically related to the Children exposed V.V.F. and M.I.V.F. to a grave risk of psychological harm within the meaning

---

[16] In her supporting brief, Fuentes also references the "inherent danger in and around Mexico City," and her belief that "Mexico City has recently become an outpost for displaced members of drug cartels," as reasons for allowing the Children to remain in the United States.  *See* Fuentes Br. 21.  However, as one district court in this circuit recently held, "the general cartel violence in Mexico . . . does not constitute the clear and convincing evidence necessary to trigger the grave risk of harm exception."  *See Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 921 (W.D. Tex. 2012) (collecting cases).  This Court agrees, and further finds that Fuentes and Vergara are more equipped than most parents to address such threats.

[17] The Court notes that Fuentes also did not request such relief either at the August 17-18, 2015, hearing, or in her supporting brief.

of the Convention.  Ultimately, however, this question is not before the Court, as Vergara has demonstrated that he dismissed these allegations with prejudice days before the August 17-18, 2015, hearing.  *See* Desisting from Further Action at 004771.  According to Fuentes's own expert, this means that under Mexican law, Vergara is "not entitled to bring these allegations anymore."  Aug. 18, 2015, Tr. 114:6-7.  Fuentes's suggestion that a third party could raise the Surrogacy Allegations in Vergara's stead is pure speculation.  Even if a third party could somehow bring such a challenge,[18] Diaz conceded on cross examination that, under Mexico's choice-of-law rules, the law of the Children's birth place (*i.e.*, Texas) would control the outcome. *See id.* at 79:17-21, 111:25-112:13.  And, in Texas, "the mother-child relationship is established by a woman giving birth [and] is not rebuttable by the results of genetic testing."  *In re M.M.M.*, 428 S.W.3d 389, 396 (Tex. App. 2014) (citing Tex. Fam. Code Ann. § 160.201(a)(1)).  As a result, the Court finds that the Surrogacy Allegations do not pose any grave risk to the Children.

In sum, the Court concludes that Fuentes has failed to meet her burden of establishing by clear and convincing evidence that any of the concerns delineated above – whether considered individually or in their totality – constitute a grave risk of physical or psychological harm to the Children.  *See England*, 234 F.3d at 270.  As a result, the Children must be returned to Mexico in accordance with Article 12 of the Convention.  *See id.*; *see also* Convention, art. 12.

E.    **Fuentes's Argument that Return Would Offend Principles of International Comity**

As a final argument, Fuentes contends that considerations of international comity prevent the Court from ordering the Children returned to Mexico.  Fuentes Br. 23-24.  Like her mootness

---

[18] During his testimony, Bustamante characterized the potential of such a third party claim as "ridiculous" and "impossible" in light of the Children's Mexican birth certificates identifying Fuentes as V.V.F.'s and M.I.V.F.'s mother.  *See* Aug. 17, 2015, Tr. 403:19-404:11.

argument, this contention rests upon Fuentes's expansive interpretation of the July 7 Order. *See id.* Specifically, Fuentes argues that "[b]ecause a return order represents a complete disregard of the Mexican [Federal Court's] order, this Court is constrained under principles of international comity to give deference to the July 7 Order and to refrain from ordering the Children's return to Mexico." *Id.* at 24.

Fuentes's international comity argument is unconvincing. As discussed in detail in the context of Fuentes's jurisdictional challenge, a return order in no way conflicts with either the language or the spirit of the Mexican Federal Court's July 7 Order. While this Court agrees with Fuentes that concerns of international comity are at the heart of the Convention, it is precisely because the Court takes those concerns seriously that it is ordering the Children returned to their country of habitual residence. *See Blondin v. Dubois*, 189 F.3d 240, 248-49 (2d Cir. 1999) ("[W]e are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it."). Allowing the Children to remain in the United States would undermine the "fundamental premise" of the Convention – "that the interests of children are best served *when they remain in their country of habitual residence while their parents resolve contested custody questions in the courts of that country.*" *Redmond v. Redmond*, 724 F.3d 729, 742 (7th Cir. 2013) (emphasis added). This Court's *refusal* to honor that commitment is what would offend notions of international comity.

Nonetheless, the Court is not blind to the pragmatic considerations that Fuentes raises with respect to the July 7 Order. Accordingly, in granting the Amended Petition, the Court emphasizes that it is *not* ordering Fuentes to physically deliver the Children to Vergara. Nor is the Court ordering that the Children must reside in a specific location in Mexico, or even in

35

Mexico City. Instead, the Court is simply ordering that, in accordance with the goals of the Convention, the Children must return to Mexico "while their parents resolve contested custody questions in the courts of that country." *See id.* All other matters – including disputes regarding international travel, visitation, and the like – are to be resolved either by agreement of the parties or, in the absence of any such agreement, through appropriate action in the Mexican judicial system. For the sake of the Children, the Court sincerely hopes that it is the former.

### F.    Vergara's Request for Costs and Attorney's Fees

The final matter that the Court must address is Vergara's request for costs and fees. *See* Am. Pet. 10. While Article 26 of the Convention states that a court "may" order the respondent to pay a successful petitioner's necessary costs and expenses, *see* Convention, art. 26, ICARA goes one step further, providing that a court "*shall* order the respondent to pay necessary expenses . . . *unless* the respondent establishes that such order would be *clearly inappropriate*." 22 U.S.C. § 9007(b)(3) (emphasis added); *see also Salazar v. Maimon*, 750 F.3d 514, 518-20 (5th Cir. 2014). In interpreting this provision, the First Circuit has characterized ICARA's "clearly inappropriate" language as "a broad caveat" that gives district courts discretion "to comply with the Hague Convention consistently with our own laws and standards." *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004) ("*Whallon II*"). Likewise, the Second Circuit has noted that, although "a prevailing petitioner in a return action is presumptively entitled to necessary costs," that presumption is "subject to the application of equitable principles by the district court." *Ozaltin v. Ozaltin*, 708 F.3d 355, 375 (2d Cir. 2013).

As the Court discussed above, the evidence at the hearing established that this was largely a crisis of Vergara's own creation. While Fuentes was on a pre-planned vacation with

the Children, a vacation that was to include Vergara, Vergara removed her as CEO of Omnilife and cut-off the Children's security protection in Mexico.  Shortly thereafter, he filed a petition in the underlying divorce proceeding claiming for the first time that Fuentes was not biologically related to the Children and seeking to prohibit Fuentes from ever having contact with the Children on that basis.  Moreover, the Court also received evidence from Reyes, Fuentes's former attorney in Mexico, that just a few days after he met with Vergara in a failed attempt to resolve the parties' divorce amicably, Vergara's cousin, Jose Vergara, led a major demonstration in front of Reyes's law offices.  *See* Reyes Dep. 58:15-21.  In particular, Reyes testified that approximately 1,500 people claiming to be Omnilife employees blocked the entrance to his building, and held signs reading "Corrupt Lawyers" and "Angelica, let us work."  *See id.* at 58:22-59:14.

  While Vergara's conduct does not justify Fuentes retaining the Children in the United States in violation of the Convention, it does mean that Vergara comes before the Court with unclean hands.  *See Delgado-Ramirez v. Lopez*, No. EP-11-CV-009-KC, 2011 WL 692213, at *8 (W.D. Tex. Feb. 17, 2011) (Cardone, J.).  Moreover, while Fuentes is not blameless, there is no indication that she retained the Children in the United States with the hope of obtaining a more favorable custody determination.  To the contrary, Fuentes submitted to the jurisdiction of the Mexican courts, and it was not until *after* Vergara filed the Surrogacy Allegations that Fuentes availed herself of a temporary SAPCR remedy in the United States.  Under these circumstances, the Court finds that an award of fees and costs to Vergara would be "clearly inappropriate" under ICARA.  *See Ozaltin*, 708 F.3d at 375; *Whallon II*, 356 F.3d at 140; *Delgado-Ramirez*, 2011 WL 692213, at *8.

III.     CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following relief:

**IT IS ORDERED** that Vergara's Amended Petition, ECF No. 58, is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Fuentes **SHALL RETURN** the Children to Mexico by no later than September 21, 2015.

**IT IS FURTHER ORDERED** that Vergara's request for costs and fees is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall close the Case.

**SO ORDERED.**

**SIGNED this 2nd  day of September, 2015.**

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE